UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NICK WILLIAMS, *et al.* | ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) No. 1:16-cv-00878-WTL-MJD |
| ANGIE'S LIST, INC., | ) ) ) |
| Defendant. | ) |

**ORDER ON PLAINTIFFS' MOTION TO COMPEL**

As this discovery dispute demonstrates, long gone are the days when physical punches on time cards definitively determined the compensation an employee was owed for hours worked on the company floor.  The hodgepodge of technological time marking involved in this case would have far exceeded the imagination of the brothers Willard and Harlow Bundy, who, in the late-nineteenth century, were the first to commercialize the once-ubiquitous punch clock.  *See* Wilson Casey, Firsts: Origins of Everyday Things that Changed the World 164 (2009).  Having punched considerable time of its own wading through the approximately 250 pages of briefing and exhibits submitted by the parties, the Court now **GRANTS** Plaintiffs' Motion to Compel.

**I.  Background**

Plaintiffs, 48 current and former employees of Angie's List, allege that Angie's List instructed them to underreport their overtime hours on their computerized time records (using a service called TimeTracker), the consequence of which is that they allege entitlement to substantial compensation under the Fair Labor Standards Act, 29 U.S.C. §§ 201-19.  To prove these claims, Plaintiffs have sought a variety of records that shed some light on their hours spent

1

laboring in Angie's List's employ.  The data sought thus far has included company TimeTracker records, badge-swipe data, and work calendars.

So far, so good, it might appear; but there is a catch: Plaintiffs frequently worked from home, and at least some of these hours are likely not reflected in any of these records—particularly if, as alleged and supported by testimony, Plaintiffs were operating under instructions not to report some of their work hours on their official time records.  Thus, Plaintiffs now seek background data automatically recorded while they were working on Salesforce, a sales platform used by Angie's List, in an effort to close the gaps allegedly left by the other records.  Angie's List has provided one year's worth of this background data already, but refuses to produce the other two years of data requested by Plaintiffs.  These additional two years of records are the subject of the instant Motion.

## II.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 37(a)(3), a party may move the Court to compel production of documents if the party's request comports with the scope of discovery.  Fed. R. Civ. P. 37(a)(3)(B)(iv).  The scope of discovery under Federal Rule of Civil Procedure 26(b)(1) is broad, only limited from the outset to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  "Information within this scope of discovery need not be admissible in evidence to be discoverable."  *Id.*  Requests for production, such as those at issue in this case, are subject to the common-sense limitation that the items be within "the responding party's possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  This Court is accorded "broad discretion in matters relating to discovery" and must be cognizant of the "strong public policy in favor of

2

disclosure of relevant materials." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002).

### III.  Discussion

Angie's List first responds to Plaintiffs' Motion with a threshold argument; namely, that Plaintiffs' request for the Salesforce records falls outside of Rule 34(a)(1) because the records are outside of Angie's List's "possession, custody, or control."  Second, Angie's List argues if the Court grants the Motion, it should apportion some or all of the costs of production to Plaintiffs.  The Court addresses each of these issues in turn.

**A.  Possession, Custody, or Control**

Angie's List first argues that it cannot be compelled to comply with Plaintiffs' request because the Salesforce background data is outside of its "possession, custody, or control."  In support, Angie's List argues that Salesforce is a third-party provider of services and that it has no greater rights to the background data than any other person.  Angie's List points to the $15,000 invoice it received from Salesforce for the background data it already provided to Plaintiffs.

Plaintiffs, in reply, argue that Angie's List's argument is belied by their conduct in producing a year's worth of background data.  Plaintiffs argue that Angie's List is conflating the requirement of "control" with undue cost or burden under the proportionality prong of Rule 26(b).

**1.  Relevant Facts**

Angie's List has used Salesforce's sales platform since 2012.  [Dkt. 100 ¶ 2 (declaration of Salesforce employee Avanti Sardesai offered by Plaintiffs); Dkt. 103-2 ¶ 2 (declaration of Salesforce employee Avanti Sardesai offered by Angie's List).]  Angie's List, as an end user of Salesforce, has regular access to a wide array of sales data and metrics.  [*See* Dkt. 103-2 ¶ 3.]

Salesforce's platform, as part of the ordinary course of business and functioning of the system, also logs background data regarding each client's Salesforce use. [Dkt. 100 ¶¶ 4-9, 12.] While "[a]n end user" such as Angie's List "does not typically access this log data" [Dkt. 103-2 ¶ 7], these event records are maintained "for Angie's List, Inc. . . . in the regular course of business" [Dkt. 100 ¶ 12]. These records may be used for a variety of purposes, including to allow Angie's List "to determine what activities an Angie's List User performed in Salesforce and the date and time when those activities were performed" [*id.* ¶ 13].

After multiple email exchanges, meets-and-confers, delays, and conferences with the Court, Angie's List produced one year's worth of Salesforce background data in response to Plaintiffs' request for production served on June 15, 2016. [*See* Dkt. 67; Dkt. 91; Dkt. 97-6; Dkt. 97-7; Dkt. 97-8; Dkt. 97-9; Dkt. 97-10; Dkt. 97-11; Dkt. 97-12; Dkt. 97-13; Dkt. 97-14; Dkt. 97-15; Dkt. 97-16.] Salesforce invoiced Angie's List for $15,000 for this "Log Analysis." [Dkt. 103-3.]

**2. Discussion**

Rule 34 governing requests for production provides the common sense limitation that a party may only be compelled to produce electronically stored information "in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Notwithstanding the dictum in *Chaveriat v. William Pipe Line Co.*, 11 F.3d 1420, 1426-27 (7th Cir. 1993), suggesting that having to ask someone else for a document means that the document is outside of a party's control, the Seventh Circuit has embraced the prevailing definition of "control" as "a legal right to obtain." *Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Engineers, Inc.*, 755 F.3d 832, 838-39 (7th Cir. 2014) (quoting *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004)). This standard is certainly broad enough to encompass a

4

contractual right to obtain documents. *See, e.g.*, *Symons Int'l Grp., Inc. v. Cont'l Cas. Co.*, No. 1:01-CV-00799-RLY, 2015 WL 4392933, at *9 (S.D. Ind. July 15, 2015) (requiring plaintiff to acquire financial documents from financial institutions pursuant to account agreements); *Engel v. Town of Roseland*, No. 3:06-CV-430 JTM, 2007 WL 2020171, at *2–3 (N.D. Ind. July 6, 2007) (same), *objections overruled in relevant part*, 2007 WL 2903196 (N.D. Ind. Oct. 1, 2007).  The party seeking discovery bears the burden of showing that the nonmovant has control over the documents sought, and the Court may consider "any reasonable evidence regardless of the rules of evidence" in determining whether the movant has met this burden.  *McBryar v. Int'l Union of United Auto. Aerospace & Agr. Implement Workers of Am.*, 160 F.R.D. 691, 695 (S.D. Ind. 1993) (citing *Nat'l Utility Serv., Inc. v. Nw. Steel & Wire Co.*, 426 F.3d 222, 225 (7th Cir. 1970)).

    The evidence before the Court demonstrates that Angie's List and Salesforce have a longstanding contractual relationship and that the background data is recorded "for" Angie's List as part of the ordinary course of their business relationship. Even while end users such as Angie's List "ordinarily" do not access such data, the evidence clearly demonstrates that they are able to do so upon asking.  In fact, the most compelling fact before the Court is that Angie's List, despite dragging its feet and protesting vociferously, were actually able to retrieve and produce one year's of the background data, collected for Angie's List as part of its use of Salesforce's sales platform, to Plaintiffs in discovery.  The fact that Angie's List has **already produced one-third** of the requested data, coupled with the evidence demonstrating the relationship between Angie's List and Salesforce, compels the conclusion that Angie's List has a "legal right to obtain" the discovery sought.

These critical facts clearly distinguish this situation from the one described in *Chaveriat*. *Chaveriat* involved the plaintiffs' contractor's subcontractor's subcontract for a one-time chromatographic analysis of soil contamination. 11 F.3d 1420, 1423. The Seventh Circuit observed that the subcontractor never ordered the actual chromatograms from the soil testing company, instead receiving a summary of the results. *Id.* at 1423-24. Those actual chromatograms, the court stated, were not within the plaintiffs' control. *Id.* at 1426-27. But as another court later succinctly observed, "[T]he relevant parties in *Chaveriat* had **no legal relationship whatsoever**." *In re Subpoena Duces Tecum to Ingeteam, Inc.*, No. 11-MISC-36, 2011 WL 3608407, at *2 (E.D. Wisc. Aug. 16, 2011) (emphasis added). Angie's List's reliance on *Chaveriat* is thus singularly misplaced and ignores the principle that "[t]he concept of control . . . is often highly fact-specific." 8B Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 2210 (3d ed. 2010). The evidence here, in stark contrast to the one-off soil test conducted by a subcontractor of a subcontractor of a contractor of the plaintiffs in *Chaveriat*, establishes that Salesforce logs the background data for Angie's List in the ordinary course of their ongoing contractual relationship and that Angie's List is able to obtain such data.

The fact that Angie's List must pay for the extracting of this data is of no moment; quite frequently, retrieving and compiling electronic discovery costs substantial sums. Indeed, all discovery costs money. The evidence suggests that this is precisely the reason for the invoiced fee. [*E.g.*, Dkt. 97-12 at 2 ("The gathering of this information is time-consuming for Salesforce . . . .").] Plaintiffs' argument that Angie's List is attempting to pigeonhole a "proportionality" argument into a "control" issue is therefore well-taken.

To conclude otherwise could introduce perverse incentives into litigation involving corporate entities. The Salesforce platform is a tool employed specifically to aid Angie's List in

facilitating its employees' work responsibilities. The data at issue pertain exclusively to these activities. Angie's List cannot avoid producing these data with the excuse that it has outsourced critical components of their employees' work tasks, all while taking full advantage of the benefits of that outsourcing relationship. Where would the line be drawn? Could companies be heard to have stored other critical employment records with third parties and then resist production on the grounds that the third party holds that data?

The Court need not resolve these complicated issues in this case. Here, Plaintiffs have met their burden of demonstrating that Angie's List has a legal right to obtain the background data, having provided evidence of Angie's List's ongoing contractual relationship with Salesforce, the fact that Salesforce specifically logs this data for Angie's List in the ordinary course of their business relationship, and Angie's List's demonstrated ability to retrieve the background data. Accordingly, the Court concludes that Plaintiffs request for production properly seeks documents within Angie's List's "possession, custody, or control" under Rule 34(a).

### B. Cost Shifting

Having determined that the background data is within Angie's List's control, the Court turns to who must pay for the production thereof. The parties agree that courts have the authority to order cost shifting where producing electronically stored information is unduly burdensome or costly. The parties disagree, however, on whether this is an appropriate case to engage in cost shifting. Angie's List asks the Court to order Plaintiffs to pay for the remaining two years of background data, largely based upon its argument that the remaining records are only marginally

relevant as against their cost.[1] Plaintiffs maintain that Angie's List should bear all of the cost, arguing that the remaining records are highly relevant.

### 1. Relevant Facts

Notwithstanding Angie's List's repeated refrain that TimeTracker provides the most accurate picture of Plaintiffs' working hours, Plaintiffs have produced ample evidence suggesting that this may not be the case.[2] This evidence falls generally into three categories:

The first of these includes Plaintiffs' sworn declarations and deposition transcripts alleging that their supervisors instructed them not to record certain overtime hours or that they were unable to do so, particularly when working from home. Angie's List, for its part, provides evidence that its policy required Plaintiffs to accurately record their hours and strictly prohibited them from working off of the clock [*E.g.*, Dkt. 39 ¶ 3; Dkt. 110-5 at 4], though apparently no employee was disciplined for violating this policy [Dkt. 110-5 at 4-5].

Second, Plaintiffs point to the gap in the TimeTracker records of nonparty Cody Boillot, a plaintiff in a related case against Angie's List. [Dkt. 85-1.] Boillot's records reflect a yet-unexplained four month gap where no time was recorded, despite having worked and recorded time during that period. [*Id.*] Plaintiffs do not, however, note any similar obvious omissions from any of Plaintiffs' records in this matter.

---

[1] Note, however, that Angie's List does not argue that Plaintiffs' request is outside the Rule 26(b)(1) scope of discovery, which is limited to discovery "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). This ruling would necessarily preclude a finding that the discovery request was disproportional, even if such an argument had been raised.

[2] The Court of course makes no assessment of the merits of Plaintiffs' claims. But some discussion of the evidence unearthed thus far in this litigation is both necessary and appropriate given Angie's List's argument that the Salesforce background data lacks reliability and relevance.

Finally, there are the Salesforce records themselves. Salesforce's software, as described above, automatically logs each user's actions while using the sales platform. [Dkt. 100; Dkt. 103-2.] According to Avanti Sardesai, a Salesforce employee, the generated records "can be used, among other things, to determine what activities an Angie's List User performed in Salesforce and the date and time when those activities were performed." [Dkt. 100 ¶ 13.] However, the background logging is not a time clock nor is it designed to record a user's working hours. [Dkt. 103-2 ¶ 7.] It records manual and automated background log events. For "certain logged entries," the system produces log data that does not reveal whether the event was manually initiated (by an employee) or automatically initiated (by the computer system). [*Id.* ¶ 14.] By process of elimination, then, all other log entries not within these "certain logged entries" do reveal whether they are generated by automatic or manual activities.

Three of the plaintiffs provide sample comparison data of Salesforce and TimeTracker data from the one year of Salesforce data that Angie's List has produced. These three Salesforce data sets reveal events logged outside of the time covered by each employee's self-reported TimeTracker records. [*Compare* Dkt. 97-2, Dkt. 97-3, *and* Dkt. 97-4 (TimeTracker records) *with* Dkt. 98-2, Dkt. 98-3, Dkt. 98-4, *and* Dkt. 104-2 (Salesforce records).] Aside from one week of Salesforce data from Plaintiff Erin Burgess's data set, these Salesforce data generally show logged entries that, if manually generated, would be consistent with working several hours outside of the ordinary working day. One week of Ms. Burgess's data set, however, shows log entries covering 165.75 hours (out of a total of 168 hours in the week). [*See* Dkt. 98-2; Dkt. 104-1.] Ms. Burgess, via affidavit, explains that she has a sleep condition and that at times she worked straight through multiple nights. [Dkt. 110-2.] Neither party identifies any other Salesforce record reflecting logged events throughout all hours of a night.

9

While Angie's List was invoiced $15,000 for one year's worth of background data and represents that it would cost an additional $30,000 to produce data for the remaining two years [*See* Dkt. 103-2 ¶ 6; Dkt. 103-3], Salesforce initially requested $90,000 for just one year of data [Dkt. 97-11 at 4].

**2. Discussion**

The Court has the authority to proportion the costs of e-discovery in cases of undue cost or burden. See Fed. R. Civ. P. 26(b)(2); *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 358 (1978). As both parties observe, district courts in the Seventh Circuit have transmuted the test for whether discovery is proportional under Rule 26(b)(1) to guide the court's discretion in whether to shift discovery costs. See *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 572-73 (N.D. Ill. 2004); *see, e.g.*, *Illiana Surgery & Med. Ctr. LLC v. Hartford Fire Ins. Co.*, No. 2:07-CV-3, 2014 WL 1094455, at *12 (N.D. Ind. Mar. 19, 2014) (collecting cases); *Annex Books, Inc. v. City of Indianapolis*, No. 1:03-cv-918-SEB-TAB, 2012 WL 892170, at *3-4 (S.D. Ind. Mar. 14, 2012). These factors, along with the Court's discretion to consider any other factors that it finds appropriate, include:

> 1) the likelihood of discovering critical information; 2) the availability of such information from other sources; 3) the amount in controversy as compared to the total cost of production; 4) the parties' resources as compared to the total cost of production; 5) the relative ability of each party to control costs and its incentive to do so; 6) the importance of the issues at stake in the litigation; 7) the importance of the requested discovery in resolving the issues at stake in the litigation; and 8) the relative benefits to the parties of obtaining the information.

*Annex Books*, 2014 WL 1094455, at *3 (quoting *Wiginton*, 229 F.R.D. at 573)). The party seeking cost shifting must rebut the "presumption that the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund*, 437 U.S. at 358; Fed. R. Civ. P. 26(b)(2)(B).

As for the first, second, sixth, and seventh factors, collectively addressed to likelihood of discovering critical information unavailable from other sources, Plaintiffs are not requesting these records on a blank slate as part of a fishing expedition. Rather, Plaintiffs have already produced substantial evidence that could undermine the asserted accuracy of the self-reported TimeTracker records in the form of affidavits, demonstrated inaccuracies in Boillot's records, and Salesforce records that strongly suggest employee activity outside of the time reflected on TimeTracker. The Court is not persuaded that the second affidavit of Ms. Sardesai, proffered by Angie's List, substantially undermines the likely probative value of the Salesforce background data. First, the same Ms. Sardesai offered an affidavit suggesting that the data would be useful in determining when employees have engaged in activity on the Salesforce platform. Second, and more critically, all Ms. Sardesai clarified in the second affidavit was that "certain" events cannot be determined to be manually generated. Without more to go on, the only reasonable conclusion that the Court may draw is that substantially all of the remaining event logs can be identified one way or the other.

Nor is the Court persuaded by Angie's List's attack on Ms. Burgess's one week of nearly-continuous activity reflected in her Salesforce records. For one, Plaintiffs have responded with at least a credible explanation for this oddity. But even if the Court gave no credit to that explanation, most critical is that the one week anomaly in Ms. Burgess's data set is just that—an anomaly, particularly in the context of the full year's background data already produced. If background events were regularly logged throughout multiple nights, Angie's List should have brought such to the Court's attention, consistent with its burden of demonstrating the appropriateness of cost shifting. Their utter failure to do so strengthens Ms. Burgess's credibility and the overall reliability of the Salesforce data set.

Plaintiffs' claims depend on demonstrating that they worked hours—frequently from home when there would be no relevant data reflected on work calendars or badge swipe records—that were not reflected in TimeTracker. They have averred that such hours occurred and the background data already produced lends support to those averments, notwithstanding the fact that "certain" log entries may have been computer-generated. The fact that the Salesforce system was not designed to track hours is neither here nor there; any user-generated event logs that do not correspond to TimeTracker hours are critical to Plaintiffs' claims that they worked uncompensated overtime hours. Thus, the Court concludes that these factors weigh strongly against cost shifting.

The third and fourth factors, addressed to the costs of production compared to the amount in controversy and the parties' resources, likewise weigh against cost shifting. Forty-nine plaintiffs, all natural persons, allege that they were instructed not to record certain overtime hours over the statutory period of three years. This total will likely blossom if the Court grants Plaintiffs' renewed request for collective action certification. The asserted $30,000 price tag on the remaining two years of background is easily outstripped by the amount in controversy. Moreover, Angie's List has ample resources to comply with its discovery obligations.

The fifth factor implicates the ability and incentive of the parties to control discovery costs. While the parties may share a desire to keep costs down, Plaintiffs have provided evidence that Angie's List negotiated the cost of producing one year's records from $90,000 to $15,000. [Dkt. 97-11.] Angie's List thus has a demonstrated ability to control costs with respect to this particular discovery request.[3] This factor also weighs against cost shifting.

---

[3] Moreover, Angie's List's position appears to be primarily tactical, given that it has likely spent a considerable portion of the anticipated $30,000 cost of production in opposing Plaintiffs' discovery request for the past ten months.

The eighth factor, addressed to the relative benefit to the parties of obtaining the requested discovery, "is the least important because in discovery the requested information is more likely to benefit the requesting party. In some cases, the information may aid the producing party, in which case it is more fair to require the producing party to pay for the discovery." *Wiginton*, 229 F.R.D. at 577 (N.D. Ill. 2004). In this case, the information could aid Angie's List if it is consistent with Plaintiffs' TimeTracker records. This factor weighs minimally against cost shifting.

The relevant factors, especially those addressed to the importance of the discovery at issue, all weigh against cost shifting. Angie's List has failed to rebut the presumption that it must pay for producing the requested discovery.

## IV. Conclusion

The clock has ticked long enough on this discovery dispute, which began in June 2016 when Plaintiffs served their first request for production on Angie's List. [Dkt. 97-6.] Plaintiffs have established that Angie's List has control over the Salesforce background data. Angie's List has failed to establish that cost shifting is appropriate. Accordingly, the Court **GRANTS** Plaintiffs' Motion to Compel [Dkt. 95] and **ORDERS** Angie's List to fully respond to Request No. 5 of Plaintiff's First Request for Production of Documents to Defendant on or before **May 1, 2017**.[4]

SO ORDERED.

Dated: 10 APR 2017

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

---

[4] As the prevailing parties on their motion to compel, Plaintiffs are entitled to "reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). Any request for such fees, along with detailed supporting documentation, shall be filed on or before **April 24, 2017**. Any response is due on or before **May 8, 2017**. Plaintiffs may reply on or before **May 15, 2017**.

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.